Good morning, and may it please the court, I'm Christopher Medeiros, I represent Mr. Ramos. If it's alright with the court, I'd like to reserve three minutes of my time for rebuttal. Alright, watch the clock. Thank you, I will. The IJ made it most of the way to granting Mr. Ramos cat protection. The IJ found that if Mr. Ramos is removed to El Salvador, he'll most likely be deprived of his liberty because of the behavioral symptoms of his bipolar disorder. Once that happens, the IJ further found that Mr. Ramos will most likely suffer physical reprisals in prison because of those same behavioral symptoms. The BIA left all of those factual findings undisturbed, and so the principal question for this court is whether the abuse that Mr. Ramos faces in prison in El Salvador will constitute torture. It will. The IJ reached the opposite conclusion because he didn't think that Salvadoran public officials would acquiesce when gang members mistreat Mr. Ramos in prison. But that reflects either a fundamental misunderstanding of this court's case law and acquiescence, or ignorance of the record. Page 469 of the administrative record... No, excuse me, I want to step back and talk about the legal standard first. In Ornelas Chavez, this court explained that public officials acquiesce in torture when they could have inferred that the torture was occurring, yet remained willfully blind or simply stood by and allowed the torture to occur because of either unwillingness or an inability to prevent the torture. And that describes perfectly how Salvadoran prison officials treat acts of violence perpetrated by incarcerated gang members. Zeroing in on the most salient parts of the record, page 469 of the administrative record explains that in Salvadoran prisons, gangs enjoy, quote, complete hegemony. And that page further explains how in prisons in El Salvador, the guards are relegated to standing along the perimeter and the walls of the prison while leaving gang members in control of every aspect of day-to-day life within the prison. And so it's no surprise that page 494 of the administrative record explains that when fights break out in prisons and when riots break out in prisons in El Salvador, the results can be a death toll that reaches the dozens. And those reports, moreover, are utterly consistent with what the Department of State has to say about conditions in El Salvador. The State Department report explains first that gangs enjoy, have a significant presence in prison in El Salvador and extensive influence there, and further explain that the smuggling of weapons into prison along with other contraband continues to be a problem. The State Department further notes that gangs broadly in El Salvador prey on members of vulnerable populations. A few other points about acquiescence. The regulatory definition of acquiescence found at ACFR 1208.18A7 makes the breach of a legal duty central to the acquiescence analysis. And it's difficult to think of a better example of when public officials breach a legal duty to prevent torture than when torture, than when somebody in state custody is tortured by other people in custody. It's also notable that the BIA didn't address the argument that the IJ aired by concluding that public officials won't acquiesce when gang members mistreat Mr. Ramos in prison. And so if nothing else, the court should remand for the agency to meaningfully reckon with that argument. However, our primary contention, and respondent doesn't meaningfully push back against this in their brief either, is that the record compels the conclusion that the mistreatment that the IJ found that Mr. Ramos is going to suffer when he's imprisoned in El Salvador will be inflicted with the acquiescence of public officials in El Salvador. And for that reason, we think that the proper remedy is to grant the petition for review and remand with instructions to grant Mr. Ramos, excuse me, deferral of removal under the Convention Against Torture. If I could just jump in real quick. We have a lot of cases in our court where clients like yours are facing, I mean, miserable conditions when these come. And we don't always grant relief. And in this area, it seems like we often have said, and there's this case from a few weeks ago, where we say, look, in this context, where someone's going to be fear of being in prison and being mistreated because the medical capabilities in the prisons are so low in some of these countries, that's not enough to grant cap. You actually have to find that there is this purposeful attempt to mistreat him. Like a lack of resources is not enough. I understand the acquiescence argument you're trying to make here. But we have these case laws saying that lack of resources is not enough. And if they don't have the resources, they don't have the resources. How do you close that gap? Sure. Like we explained in our supplemental brief, this case is different from Acevedo Granados because the IJ made a series of very specific factual findings. The IJ found that Mr. Ramos, when he's in prison, will be, quote, at the mercy of the prison officials and gang members. And so our primary – and the IJ found that he will most likely suffer retaliation for his behavioral symptoms. And so our primary cat claim isn't one that has to do with lack of resources or, you know, treatment that has the incidental effect of causing him pain because, you know, electroshock therapy was also central to the petitioner's claim in Acevedo Granados. Here, the thrust of Mr. Ramos' principal cat claim is that gang members and prison officials are going to inflict purposeful physical pain on him. We're talking about beatings or perhaps even execution, two things that the country conditions reports, you know, bear out. And that public officials, if they don't inflict that, will acquiesce when gang members do inflict that mistreatment. And so this case really is – it's a cat claim of a different sort that was at issue in Acevedo Granados. It doesn't hinge on resources or negligence, as was the problem in Acevedo Granados and also Villegas. But rather, the IJ found that gang members are going to inflict physical pain, purposeful physical pain upon Mr. Ramos. And our contention is that the only error that this court needs to correct is the IJ's conclusion that public officials won't acquiesce when gang members do that. And so going back to my earlier point, for that reason, we think that the proper remedy is not only to grant the petition for review but to remand with instructions to grant Mr. Ramos' deferral under the cat. And the reason for that is because unlike Guerra, where the error, because it had to do with the standard of review, pervaded the agency's entire analysis, here there's not any dispute about the facts. And once the court applies the proper acquiescence analysis to those undisputed facts, there'll be nothing left for the agency to do post-remand. Because like in Haley, the evidence is uncontested and it compels the conclusion, especially given the IJ's findings of fact about what's going to happen to Mr. Ramos once he's removed, that Mr. Ramos is more likely than not to be tortured if his removal order is executed. So as I understand your argument, this is distinguishable from Acevedo-Granados because the torture will be by the gang members, not by the government. And the gang members can be reasonably deemed to intend, have the specific intent to torture, and then this is torture that the government is unwilling or unable to control. That's exactly right, Judge Wardlaw. It's not that the gang members are going to apply archaic treatments. It's that they are going to beat him or perhaps even execute him and that the government is going to acquiesce in that. And the case law is clear that when we're talking about the government inflicting torture, the government needs to have specific intent, of course. But when we're talking about the government acquiescing in torture by third parties, by private parties, the government doesn't need to have the specific intent that private parties, in this case the gang members, inflict torture. It's just enough that the government breaches its legal duty and that can be because of unwillingness or inability. And that can be where resources enter the discussion. But our primary claim is exactly how you just described it, Judge Wardlaw, that gang members are going to torture or perhaps even execute Mr. Ramos and that prison officials are going to either be willfully blind or simply stand by and allow that to occur. And so while we submit that that's the primary grounds for the court to grant the petition for review and the most straightforward and judicially minimalist, it's not the only way to resolve this petition for review. In pulling back and considering Mr. Ramos' risk of torture from all sources, which is something that parenthetically the agency didn't do, and that's another reason to remand, the record compels the conclusion that considering all of those sources that Mr. Ramos is more likely than not to be tortured if he's removed. And that's especially so if the court holds that 8 CFR 1208.18A1, where it talks about specific, excuse me, A5, where it talks about specific intent. That specific intent there means the same thing as knowingly, because that sweeps in things like denial of medical care and malnutrition. And we submit that that's the only tenable reading of subsection A5 in the regulations, which provides for the specific intent requirement. And that's so for two textual and one practical reason. Starting first with the text, subsection A1 explains that to constitute torture, the acts need to be undertaken for a specific purpose, a prescribed purpose, and that it enumerates a number of those purposes, none of which are for the sake of causing pain. And so that shows that torture, that mistreatment constitutes torture in the cat, even when it's not undertaken with the specific purpose of causing pain or suffering. Subsection A5 also divides mistreatment into that which is specifically intended and that which results in an unanticipated severity of pain and suffering. And so when when somebody undertakes acts knowing that they will cause pain, but with a purpose that's aside from that, that that clearly under the dichotomy that subsection A5 sets up that shows that, you know, acts that satisfy a knowledge standard, but not necessarily a purpose standard constitute torture. And I see I'm approaching three minutes. So unless the court has any other questions, I'd like to reserve the balance of my time. All right. Thank you, counsel. Ms. Browning. Thank you, Your Honor. May it please the court. Again, Rachel Browning for the attorney general. The record evidence in this case simply does not help. Hold on. Hold on one second, Ms. Browning. OK. Is it clock? OK, you may proceed. Our clock was doing some dancing. All right. Start all over. OK. We submit that the record evidence in this case simply does not compel the conclusion that Mr. Ramos has met his high burden for establishing that he more likely than not would face torture by or with the acquiescence of the government of El Salvador. And the regulatory definition says that for an act to constitute torture, it must be specifically intended to inflict severe physical or mental pain and suffering. And as this court recently reaffirmed in Acevedo Granados, the specific intent standard confirms that an applicant must show that the actor intends the actual consequences of his conduct as distinguished from the act that causes the consequences. And I just want to point out that the judge did not make a finding that Mr. Ramos would more likely than not face any kind of harm. The judge found that there was a possibility that due to some of his behavioral issues, there was a possibility that he could come into contact with law enforcement and a possibility that he could end up in prison where there was another possibility that he would be at the mercy of gang members. But taking all of that into consideration, in addition to other evidence of record, the judge concluded that this does not meet the burden of establishing that he more likely than not would face torture by or with the acquiescence of the government. So this is a case about resources and a lack of specific intent. We don't the government doesn't argue about what the different conditions are in prisons and mental health institutions, a lack of access to care, medical care, medication, what have you. But before the judge, it was never Mr. Ramos's contention that anybody was going to intentionally withhold medicine from him such that he would start acting out in ways that would bring him to the attention of law enforcement. Nor did he ever claim to be afraid of gang members. He simply said that he was afraid of the police, but admitted that he'd never been arrested during the year, a year and a half that he was back in El Salvador as a teenager. And he was afraid he didn't know how he would adapt. But his own testimony didn't indicate that his primary fear was to wind up in prison where he was going to be tortured by gang members. And while we don't dispute that that can happen again, the legal issue is whether the evidence compels the sole conclusion that this more likely than not will happen to him because of his particular circumstances. You know, also relevant to the likelihood of torture is the lack of past torture. The judge acknowledged the poor conditions in prison and that some security forces torture. And but it also pointed out that Salvadorian law prohibits torture and that there have been very few complaints. And that more likely the prison conditions, the prison conditions were harsh and life threatening. But that was due to overcrowding, unhygienic conditions and gang activities that are simply hard to control. And so we submit that this case is analogous to Acevedo Grenados and that which also involved El Salvador, that these institutions do have their problems. But the evidence is not there that the government has created these conditions to result in the pain and suffering that constitutes torture. As that as that is defined in the regulations and by this court. Hey, Capra, if I could jump in, there's an argument that Mr. Madero makes, which I find interesting in this case. It's not the one that he really wants us to win on. Let me be clear about that. But there is a secondary argument on page 60 of his brief where he says that the BIA did not address all of the grounds that he claimed could be possible for most of this case was focusing on torture in the prison itself. But then there were mentions of death squads and things like that. And I saw there's a footnote in your brief where you kind of say those are not those were not fully exhausted below. He didn't make the argument. Let's say for a moment we disagree with you. We look at the record and we say, boy, they are 16 of the of the record. He does talk about death squads and he cites some cases along these lines. If we assume that he did exhaust those arguments before the BIA and the IJ, what's your response to his argument? So the footnote that's in the brief about exhaustion to say that that doesn't work. What is your response to his argument there about about addressing all of the different forms of torture and the new and the aggregate? Well, the board, I mean, the board still has to have all the bases before it to address. So that's why we made the exhaustion. Sure. No, I'm not saying you're wrong. I'm not saying you're wrong, but I'm just trying to for analysis purposes. Let's say we disagree with the footnote. And we have to hit this on the merits. What's your response to his argument on the merit? Because with respect to those specific claims, I mean, that goes more to, again, the general conditions that there's violence. And, you know, many problems, whether you're talking about death squads or gangs in and out of prison or, you know, security forces. Any another any number of actors who could possibly torture someone at any given time. But again, you know, for this case, for this petitioner specific burden of proof, it doesn't establish what he needs it to. Let me ask you this. We have this case, Cole versus Holder. Yes. I'm sure the government's not not a fan of that one, but it is there. It's distinguishable. There you are. How so? Because in that case, there were a couple of things that there was a specific claim. Again, it went to first that where there was the claim that that medicine was going to be intentionally withheld from that particular petitioner. The board didn't address it or glossed over. I don't have the board's decision on that case in front of me. And what the court said that the board needed to at least address the claim, because in the intentional withholding of medication could could. It didn't say it would, but could constitute specific intent to torture. And as I pointed out before, petitioners never made that claim in this case. But it's cold. Let me jump in real quick there. If he were to say that if we read his briefing before the CIA to say that he was worried about death squads torturing. And I understand you dispute that. I'm not asking you to concede that. But if we just start at that point, did the BIA ever address that argument that the death squads when he was out of prison would torture? I don't believe the board specifically addressed that, but I don't recall him specifically making that argument to the board. Well, I mean, the board's not going to go through. It's not the board's job to go through all of the evidence and find any potential claim. If the district himself hasn't made it. Right. Well, let's consider it instead of dancing around it. Let's let's take a look at A.R. 16. He talked about on A.R. 16, he talked about he talked in the first paragraph, he talked about torture. Then the next paragraph, he talks about death squads. So I'm not sure why that wasn't raised if he's talking about torture and death squads before the CIA. Well, he never raised it to the judge, which is potentially why the board didn't address it. Well, but it's in his brief. It's in his brief to the BIA. Isn't that why isn't that enough? Because the BIA can't make independent findings that the judge didn't make. So you're saying he never told the judge that death squads are going to kill me. You can't raise that claim to the board and have the board address it in the first instance. That's a fact. That's a predictive finding of fact. So you're saying it was never raised to the IJ. Correct. OK, well, when Mr. Medeiros gets back on, I would like him to address that, but continue. And the only other thing I was going to point out about Cole that I believe distinguishes it from this case is that there were two expert witnesses that testified on petitioner's behalf in that case. And the board only referenced one of them in finding him or her unpersuasive. And so the court remanded the case so that the board could address the other experts testimony. That's not an issue here. The agency took into account the one expert. And, you know, the one expert didn't really have a whole lot to say with respect to what would happen to petitioner in El Salvador. She was more describing his behavior and his specific diagnosis and how that manifests itself. And I believe she said that, you know, if he were to stop taking his medication, then certain, you know, that would be that would manifest itself in behavioral ways. That would be apparent. It could possibly be apparent to law enforcement. So let me go back to the question about whether it was raised to the IJ. In the country report summaries that were submitted to the IJ, there is a discussion about the death squad phenomenon. And would that not be enough? Again, it goes to general conditions. I mean, if there's a reason, petitioner still has to establish that he's going to be targeted by a death squad. No. So I think we're talking about two different things here. The first question is, is that was it sufficiently raised to the IJ? And you had indicated that it wasn't. And I'm asking if it's in the summary of the country reports that were submitted to the IJ, why wouldn't that be enough to preserve the issue? Because the petitioner still has to make a specific claim with respect to himself. I mean, these country reports have all kinds of information in them. And again, I mean, even though torture claims does not be on account of, as there is in other, you know, in the asylum and withholding context, you still have to establish that you are going to be targeted. So simply, you know, pointing out that these conditions exist, again, isn't enough to meet the high burden of proof that someone is going to have the specific intent to torture you and either be a government actor or someone under the government, with the government's acquiescence. You know, rereading this IJ opinion, you look at page 19, the IJ actually finds that this will probably, he has an issue with confronting others and starting violent confrontations. This will probably happen in a Salvadorian jail or prison. The gang members then would probably retaliate. Well, that to me probably is more likely than not. But what the IJ turns on is there's no evidence of acquiescence, even though there are instances where the authorities have been complicit in such actions. I mean, if we were to find that the reports show that the government is unable or unwilling to control that kind of violence, hasn't the IJ made findings that it's more likely than not that it will happen? I don't believe it's not the unwilling or unable. For acquiescence, the government has to, you know, essentially approve of what's happening and understand that it's happening and thereafter evade their duty to correct it. And that's what's been lacking in, you know, many of these Salvadorian cases, including Acevedo, is that it's not enough for acquiescence to know that these conditions exist and not to be able to control them when it's about lack of resources and overcrowding. I mean, these are difficult cases, you know, but again, you know, we go back to the burden of proof and the need for specific intent. And so for that reason, the government submits that petitioner has not been as burden of proof in this case. All right. Thank you, Kat. So, Mr. Medeiros, you have three minutes. Thank you, Judge Wardlaw. I want to start with the point about exhaustion. So I think one of the main problems with Respondent's exhaustion argument is that it overweighs Mr. Ramos's expression in testimony of his subjective fear of torture. And it's important to keep in mind that Mr. Ramos was found not competent to represent himself below. And so whether he exhausted something can't turn on. I mean, he's not an expert in Salvadorian country conditions. He hasn't been there since he was a teenager. It's whether or not an issue was exhausted can't turn on whether an incompetent person enumerated that particular torture risk factor. And I think that Respondent's arguments about exhaustion also overread this court's exhaustion requirement. The court requires issue exhaustion, but it doesn't require exhaustion of precise arguments. And indeed, petitioners or this court are free to refine their arguments, even if they weren't articulated exactly in that manner before the agency. And that's crucial here because although counsel for Mr. Ramos did not name death squads in her closing argument, counsel for Respondent's submission was that, or he was Respondent below. Sorry, that was confusing. Counsel for Mr. Ramos's submission below was that Mr. Ramos, if moved to El Salvador, is more likely than not to be tortured, period. And counsel for Mr. Ramos also discussed his likelihood of having a run-in with law enforcement because of the behavioral symptoms of this bipolar disorder. And we submit that taken together, those two contentions encompass the argument, or at least let us raise now the argument, that death squads might torture him. Because death squads are paramilitaries. They're para-law enforcement. And I don't think that before the agency, counsel for Mr. Ramos needed to make that necessarily fine-grained distinction. And as Judge Owens notes, death squads are all over the State Department report. And that's, of course, the country conditions report that the agency holds out as, you know, the most trustworthy. And the country conditions report that these cases often turn on. And so because death squads are so crucial to that document, we submit that, you know, this court has explained that to exhaust an issue, the party needs to put the agency on notice of it. And we think Mr. Ramos more than did that here, both when it comes to death squads, and more broadly that his aggregate risk of torture from all sources surpasses 50%. And I see my time's running out, and I want to, unless the court has any other questions, I want to leave it with this. Turning to Judge Wardlaw's point about the immigration judge's factual findings and inacquiescence, the immigration judge, after explaining that he didn't think public officials will acquiesce in Mr. Ramos's torture in prison, didn't provide a citation sentence. And I really don't think that he could have. There's no page in the administrative record that the IJ could have cited to that supports the notion that when gang members torture Mr. Ramos in prison, prison officials won't acquiesce in that torture. For that reason and others, the court should grant the petition for review and remand with instructions to grant Mr. Ramos cap protection. Thank you, counsel. Thank you for an excellent argument. Also, Mr. Medeiros, thank you and your firm for the pro bono representation. Thank you. It's really been a tremendous privilege. Ramos v. Garland will be submitted, and the session of the court is adjourned for today.
judges: Wardlaw, Gould, Owens